## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 09 2017, 8:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Christine A. Milcherska
Brownwood, Texas

ATTORNEYS FOR APPELLEE

Michael K. Wandling
Anna D. Saar
Wandling & Associates
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Marriage of
Christine A. Milcherska,
*Appellant-Petitioner,*

and

Douglas R. Biggs,
*Appellee-Respondent.*

June 9, 2017

Court of Appeals Case No.
71A03-1605-DR-1203

Appeal from the St. Joseph
Superior Court

The Honorable Margot F. Reagan,
Judge

Trial Court Cause No.
71D04-1408-DR-544

**Mathias, Judge.**

[1]    Christine Milcherska ("Mother") wanted to move her teenaged daughter G.B. from Mishawaka, Indiana, to Brownwood, Texas. Mother's ex-husband and G.B.'s father, Douglas Biggs ("Father"), objected. After protracted litigation,

St. Joseph Superior Court entered a consent judgment keeping G.B. with Father in South Bend, Indiana. The court also ordered Mother to pay a part of Father's attorneys' fees and a part of the guardian ad litem's ("GAL") fees. From these orders and several antecedent rulings, Mother now appeals.

We affirm.

## Facts and Procedural Posture

G.B. was born to Mother and Father in 2000. Shortly after her birth, Mother and Father married. In 2003, they divorced. Mother and Father married again on July 21, 2013, and divorced again on October 8, 2014, under the instant cause number in St. Joseph Superior Court. Mother and Father were given shared legal custody, Mother was given primary physical custody, and Father was given parenting time and ordered to pay support.

In January 2015, Mother lost her job in Indiana and found a new one in Texas. Mother planned to move G.B. to Texas with her but did not notify Father or the court, as she was required to do. Around the same time, she began to deny Father parenting time with G.B., believing it not to be in G.B.'s best interests. On April 8, 2015, Father asked St. Joseph Superior Court for a rule to show cause why Mother should not be held in contempt for denying Father's parenting time. On April 17, 2015, Father filed a second rule to show cause for Mother's failure to serve notice of intent to relocate, as well as motions to give Father primary physical custody of G.B., appoint a GAL, and restrain and enjoin Mother from leaving the state with G.B. The rules issued.

At a hearing on May 6, 2015, Father's motion to modify custody, the pleading that drove this case, was set for a full evidentiary hearing. That hearing was continued repeatedly until March 1, 2016. In view of G.B.'s attachments in Indiana and the court's desire to minimize any disruption to G.B.'s schooling, the court temporarily restrained Mother from moving G.B. to Texas until Father's motion to modify custody could be heard and decided. Mother would move to Texas by herself, and the parents would alternate periods of parenting time in Texas and Indiana. Mark James ("James"), already the GAL for one of Mother's daughters by a different father in a similar proceeding in St. Joseph Probate Court, was appointed GAL for G.B. over Mother's objection. Because Mother raised concerns about Father's alleged use of marijuana, cocaine, and alcohol, the court also prohibited both parties to use alcohol or illegal drugs within twenty-four hours of parenting time with G.B. Mother and Father were ordered to mediation, which proved unsuccessful.

On July 6, 2015, the GAL filed a report recommending that G.B. not move to Texas with Mother and that Father be given physical custody. On July 10, 2015, Mother moved to strike the report, remove James as GAL, and appoint a new GAL, alleging that James "failed to conduct an objective investigation . . . [and] has become aligned with . . . Father in an attempt to undermine [G.B.'s] relationship with . . . Mother . . . ." Appellant's App. p. 221. Moreover, James, having spoken twice with the parties' mediator, summarized in his report a parenting-time plan to which the parties had "tentatively" agreed in mediation

and deemed it "reasonable." *Id.* p. 238. The contents of the parties' compromise discussions, Mother argued, were confidential and inadmissible.

[7] At a hearing on July 15, 2015, after hearing from the parties and the GAL, the court denied Mother's motions to strike the entire report and to replace James as GAL, but agreed that mediation discussions were confidential and inadmissible. The court therefore ordered James to strike the offending statement and resubmit his report.

[8] On July 24, 2015, Mother moved to lift the temporary restraining order ("TRO") against her moving G.B. to Texas, arguing that, now that the parties and the court knew where Mother would be moving, the grounds for issuing the restraining order in the first place had dissolved. Indeed, Mother had already taken matters into her own hands by disenrolling G.B. from her high school in Indiana and enrolling her at a high school in Texas, without Father's knowledge or consent. Mother also moved for a change of judge "for the reason that the Judge ha[d] shown bias against [Mother]" by her rulings in Father's favor. *Id.* p. 214. On July 30, 2015, Mother moved the trial court to certify for interlocutory appeal its rulings as to the GAL and the GAL's report, and to stay proceedings while the appeal was pending.

[9] At a hearing on August 4, 2015, Mother's motion for change of judge was struck for failure to comply with the Trial Rules, and a ruling on her motion to lift the TRO was reserved until her motion to certify could be heard and decided. Frustrated with the course of proceedings, or unable to accommodate

the agreed parenting-time schedule, or both, Mother relinquished her last period of summer-vacation parenting time to Father. On August 6, 2015, Mother refiled her motion for change of judge.

[10] At a hearing on August 17, 2015, Mother by counsel argued in support of her second motion for change of judge as follows:

> During [the July 15, 2015,] hearing, you [the court] stated on the record that you had already spoke[n] to [GAL] Mark James prior to the hearing. . . . [T]here was no indication what that conversation was about . . . .
>
> [At the August 4, 2015, hearing, after recessing for lunch,] I observed Mark James and yourself conversing off the record. . . . I heard a conversation about this case and then either yourself or Mr. James covered up the microphone . . . in an effort to presumably conceal your conversation from everyone . . . .
>
> Following the conclusion of the second part of that hearing, again, Mr. James waited in the courtroom for us to exit . . . . Again, the two of you began conversing off the record.
>
> As you know, an ex parte communication undermines the fairness of a judicial proceeding by introducing new information to the decision[-]maker, who is you . . . . [Under the relevant standard,] a judge should recuse herself when an objective person . . . would have a reasonable basis for doubting the judge's impartiality.

Tr. pp. 147–49. The judge, "not really understanding what [Mother's] complaint [was]," *id.* p. 162, declined to recuse herself and denied Mother's motion.

[11] The court further denied Mother's motion to certify its rulings as to the GAL for interlocutory appeal, noting that "interlocutory appeals are strongly disfavored" and doubting that "terminating [the GAL's] services and striking his report . . . [was] a substantial question of law" meriting interlocutory review. *Id.* p. 204. Apparently in the hope that Father's underlying motion to modify custody could be heard and decided in the near future, and on the understanding that Mother's motion to lift the TRO had been filed in contemplation of interlocutory review now denied, Mother's motion to lift the TRO was not heard. Finally, Mother again raised concerns about Father's use of marijuana and cocaine, and the court ordered both parties to submit to hair-follicle drug testing.

[12] On August 24, 2015, Father's hair-follicle test showed use of marijuana and cocaine within the last ninety days. On August 25, 2015, Mother filed an emergency motion to lift the TRO and to suspend Father's parenting time. At a hearing on August 31, 2015, on Mother's emergency motion, Mother adduced Father's test results as well as exhibits showing that fifteen-year-old G.B. followed several risqué social media accounts online, faulting Father for not having "initiated counseling" and speculating that G.B. wanted to remain in Indiana because teenagers "turn to the parent who doesn't care what they do." Tr. p. 225. In response, Father submitted a urine test taken that morning showing no trace of drug use, and indelicately began to explore Mother's history of personal relationships. The GAL testified he did not think G.B.'s social media use was seriously concerning, and reported that G.B. had been

shocked and angry to learn of Father's positive drug test, but had not been exposed to Father's use and was not, in the GAL's opinion, endangered by it.

[13] The court, finding no emergency existed, reserved ruling on Mother's motion until G.B. could be interviewed *in camera* and a psychologist whom G.B. had been seeing in Texas — at first without Father's knowledge or consent — could be interviewed by telephone. On September 2, 2015, having spoken with G.B. and her psychologist, the court denied Mother's motion to lift the TRO, weighing Father's drug use, G.B.'s

> strong feelings about the significant others of her parents[, positive about Father's live-in girlfriend, negative about Mother's live-in fiancé]; her school friends and activities[, including theater, to which G.B. was very dedicated]; perceived changes in Mother; [the] conduct of each parent; the maturity of [G.B.]; [and] exposure to cigarette smoke [in Mother's home but not in Father's] . . . .

Appellant's App. p. 174. Father was ordered to submit weekly urine screens.

[14] On November 2, 2015, Father's weekly urine screen showed use of cocaine. On November 12, 2015, Mother filed a second emergency motion to lift the TRO and to suspend Father's parenting time, and motion for a rule to show cause why Father should not be held in contempt for failing to comply with the

court's order not to use drugs.[1] At a hearing on November 20, 2015, the court heard from the technician responsible for evaluating Father's drug screens, from Mother, and from the GAL. After extensive testimony and argument, the hearing was continued to allow the GAL to interview family members in and around South Bend with an eye to determining alternative placements for G.B. in Indiana. Father was ordered to submit another hair-follicle test, in addition to submitting weekly urine screens as before.

[15]     The parties agreed that G.B. would spend Thanksgiving weekend with Mother and G.B.'s half-sister in South Bend, and one week of Christmas break with them in Texas. After a status conference by telephone on December 18, 2015, in a summary of that conference, the trial court found that Mother

> subsequently did not exercise [the Thanksgiving] parenting time, without notice, leaving [G.B.] distraught . . . .
>
> [Then Mother] unilaterally . . . decided that [Christmas] visitation with each girl must be *separate* and apparently threatened that if [G.B.] didn't agree, there would be no parenting time. . . .
>
> [On the same day as the status conference, Mother faxed] a letter . . . to Judge's chambers. It purported to be ex-parte

---

[1] Our review of the record did not reveal when or how the court's order of May 6, 2015, not to use drugs or alcohol within twenty-four hours of parenting time with G.B. was converted into an order not to use drugs at all.

communication with the Court. The Judge did not read any of the letter and instructed staff not to read it.[2] . . .

[Mother's] behavior towards [G.B.] amounts to "blackmailing" to get [Mother's] way and amounts to emotional abuse. If this continues, parenting time will be terminated altogether.

*Id.* pp. 140-42 (original emphasis). On December 30, 2015, Mother filed a second motion for change of judge.

[16] On January 7, 2016, the hearing of November 20, 2015, was resumed. In support of her second motion for change of judge, Mother argued that the court's characterization of her conduct in its December 18, 2015, summary of the parties' status conference demonstrated incurable bias against her. The judge, noting the GAL's report that Mother's conduct had "devastated" G.B., Tr. p. 478, concluded that she was not biased and had shown no bias, but that Mother's conduct could give rise to "no other impression" than the one memorialized in the summary. *Id.* Mother's motion for change of judge was denied.

[17] On Mother's still pending motion to lift the TRO and suspend Father's parenting time, the court heard the GAL's report on possible alternative

---

[2] Mother has put her letter in the record. In it, she alleges that G.B. "calls me and screams at me, insults me, makes demands . . . . [G.B.] continues to be blatantly disrespectful toward me and yet her actions are being supported by the court? . . . I would appreciate it if you would consider for a moment that I am a good mother, and am doing what I know is best for my daughter. . . I cannot, as her Mother, allow her to come [to Texas] the first week after her disrespect, threatening and demanding that I do so. Doing so would only reinforce to her that those actions are appropriate ways to get what she wants. . . . I pray that you will allow me to do what I know what is best for my daughter." Appellant's App. pp. 145-46.

temporary placements for G.B. in Indiana. The GAL was extensively cross-examined by Mother on *inter alia* his continuing recommendation that G.B. be placed permanently with Father despite Father's drug use: "[T]he drug use is one piece. When I look at everything else, the everything else outweighs the substance abuse." Tr. p. 526. After the parties stipulated to a near-term parenting-time schedule, the hearing was again continued.

[18]     On January 15, 2016, the hearing of November 20, 2015, and January 7, 2016, was resumed and concluded. The GAL was again examined and cross-examined. The court and the parties agreed that no emergency existed, and thus there was no emergency basis for lifting the TRO, and that suspension of Father's parenting time was a moot question after the parties stipulated to a near-term parenting-time schedule. Accordingly, Mother's November 12, 2015, emergency motion to lift the TRO and suspend Father's parenting time was denied or withdrawn.[3] Father was held in contempt for his drug use, as prayed for in Mother's November 12, 2015, motion for a rule to show cause. Father's court-ordered drug tests were suspended in light of Father's enrollment in a ten-week substance-abuse counseling program involving regular drug tests, with results to be forwarded to the court. Father's underlying motion to modify custody received its final setting for a full evidentiary hearing on March 1, 2016. Finally, by agreement, the GAL offered one piece of testimony outside the

---

[3] No entry in the chronological case summary notes the final disposition of Mother's November 12, 2015, motion.

presence of the parties but in the presence of counsel: that Mother's fiancé had offered G.B. $400 if she would tell the court and the parties that she wished to move to Texas.

[19]     On February 17, 2016, Mother notified her lawyer that she could no longer afford representation, instructed her lawyer to withdraw from the case, and announced her intention to proceed pro se at the evidentiary hearing. Counsel's motion to withdraw was granted on February 22, 2016. At the opening of the evidentiary hearing on March 1, 2016, the court announced the parties had reached a partial settlement and had the following colloquy with Mother:

> [Court]:     [Y]ou wish to proceed today without counsel[,] is that correct?
>
> [Mother]:   Yes, your Honor. . . .
>
> [Court]:     [Y]ou understand that [Father's counsel] represents [Father] and he wasn't representing you in putting this settlement together, but you knew that. Are you agreeable?
>
> [Mother]:   Yes, your Honor.
>
> [Court]:     And your participated in every word of that settlement, correct?
>
> [Mother]:   Yes, your Honor. . . .
>
> [Court]:     [T]here is more pressure . . . put on what we call a pro se litigant. In every situation where you represent yourself, you are by law held to the same knowledge and experience of an attorney. . . . [Y]ou act with the expectation by the Court that you know

> the rules . . . . [Y]ou must understand that I can't help you. Okay?

[Mother]:     Yes.

[Court]:     And so you have chosen to go forward with that knowledge, correct?

[Mother]:     Yes.

[Court]:     Okay. Then in that case, I find that you can represent yourself with full knowledge as to the consequences.

Tr. pp. 648-49.

[20]   The court then recited the terms of the settlement and both parties consented to them. Along with disposing of various collateral issues, the settlement maintained shared legal custody but awarded primary physical custody to Father, keeping G.B. in South Bend. Mother would pay $199 per week to Father for G.B.'s support. A consent judgment reflecting the settlement's terms was entered by the court on March 22, 2016, reserving a ruling on attorneys' fees and the GAL's fees pending evidence and argument. The judgment order noted that "[a]ll other [motions] are deemed resolved, withdrawn, or vacated." Appellant's App. p. 30.

[21]   Throughout this litigation, Mother and Father disputed their relative incomes with respect to responsibility for attorneys' fees and the GAL's fees. The trial court heard extensive testimony on the parties' incomes for most of the March 1, 2016, hearing. Mother's income was consistently found to be $120,000 per

year, both at her old job in Indiana and at her new job in Texas. Father, a sometimes self-employed auto mechanic, was found to make from "$18,000 to around $30,000 . . . per year. At most, he earn[ed] one-fourth . . . of Mother's income. Recently, he has earned closer to one-sixth . . . of Mother's income." *Id.* p. 22. This determination was based on Father's tax returns from 2013 and 2015, Mother's testimony regarding Father's earning potential, and Mother's independent research into the median income for auto mechanics.

[22] On March 29, 2016, the trial court ordered Mother to pay seventy-five percent of the GAL's fees, $5,341.12, and, on April 25, 2015, seventy percent of Father's attorneys' fees, $13,151. In ordering Mother to pay Father's attorneys' fees, the trial court noted,

> [T]he disparity in income [between Mother and Father] is very large. Mother chose to move to Texas without filing a notice [of intent to relocate]. . . . Mother continued to fight in spite of [G.B.]'s desires [to stay in Indiana, supported by the court, the GAL, and others]. [Mother] challenged the GAL and Judge with multiple filings. She knowingly pushed forward for months while [G.B.] was made miserable. She used methods which may be characterized as emotional blackmail. Several times when she was granted specific parenting time, she did not take it. . . . Mother's argument regarding Father's drug use was compelling on its face but her controlling, often hurtful behavior towards [G.B.] diminished her position given all the evidence . . . . Now she complains of the . . . fees in this case and in her other custody battle with a different father and child. Given the economic factors and Mother's ongoing battle knowing [G.B.] (who is now sixteen) didn't want to leave Indiana, convinces [*sic*] the Court that the hefty fee bills were in large part unnecessarily incurred by Mother's unreasonable behavior.

*Id.* pp. 22-23.

[23] On April 21, 2016, Mother moved to correct error in the consent judgment order of March 22, 2016. Mother claimed that, at the hearing, she told the court "she could not and was not prepared to represent herself in the matter." *Id.* p. 39. Further, Mother claimed to have been approached by her own, now estranged, mother in the courthouse hallway before the March 1, 2016, hearing, who told Mother that G.B. had threatened suicide, and then by Father's counsel to discuss the settlement, in a concerted effort to take advantage of her impaired emotional state: "[D]espite Mother[']s months of preparation for . . . trial, . . . such disingenuous tactics by [Father's counsel] and [Mother's] own Mother . . . , furthered by the court[']s lack of response when [Mother] was requesting to seek legal advice, . . . [meant that Mother] was not in the right frame of mind to represent oneself in this hearing." *Id.* p. 40.

[24] On April 27, 2016, Mother moved to correct error in the trial court's March 29, 2016, order as to the GAL's fees, complaining of the conduct of the March 1, 2016, hearing, and of the trial court's findings as to Mother's and Father's respective incomes. Mother concluded that, "during this hearing, Mother was visibly upset and shaken and crying and the court continued in course." *Id.* p. 34. The trial court ruled on neither of Mother's motions and both were deemed denied.

[25] Mother now appeals, raising the following restated issues. With respect to the validity of the consent judgment, Mother claims her uncounseled consent was

the product of fraud, mistake, or duress. With respect to the consent judgment itself, Mother claims the trial court abused its discretion by ordering her to pay $199 per week for G.B.'s support. With respect to the trial court's rulings prior to entry of the consent judgment, Mother claims the trial court abused its discretion by denying her motions as to the GAL and his reports; by denying her motion to certify the rulings as to the GAL and his reports for interlocutory appeal; by denying her motions for change of judge; by holding Father in contempt only once; by allowing the GAL to testify that her fiancé tried to bribe G.B. to move to Texas; and by issuing the TRO and denying her motions to lift or modify it. With respect to rulings after entry of the consent judgment, Mother claims the trial court abused its discretion by ordering her to pay seventy percent and seventy-five percent of Father's attorneys' fees and the GAL's fees, respectively.

[26] Father opposes Mother's claims and seeks sanctions, urging us to find Mother's appeal to be frivolous and in bad faith.

# Discussion and Decision

## I. Consent Judgment: Validity and Preclusive Effect

[27] "[P]arties who are competent to contract and not standing in confidential relations to each other may agree to the rendition of a judgment or decree respecting any right which may be the subject of litigation." *Gallops v. Shambaugh Kast Beck & Williams, L.L.P.*, 56 N.E.3d 59, 62 (Ind. Ct. App. 2016)

(quoting *State v. Huebner*, 230 Ind. 461, 104 N.E.2d 385, 387 (1952)). A consent judgment, or agreed judgment,

> has a dual aspect. It represents an agreement between the parties settling the underlying dispute and providing for the entry of judgment in a pending . . . action. It also represents the entry of such a judgment by a court—with all that this means in the way of committing the force of society to implement[ing] the judgment of its courts.

*Hanover Logansport, Inc. v. Robert C. Anderson, Inc.*, 512 N.E.2d 465, 470 (Ind. Ct. App. 1987). Construed like a contract, a consent judgment may be entered on fewer than all issues in a case if the intent of the parties to reserve the remaining issues is clear. *Id.* at 471.

[28]   Absent fraud or lack of consent, a trial court must approve and enter a consent judgment. *City of New Haven v. Allen Cnty. Bd. of Zoning Appeals*, 694 N.E.2d 306, 310 (Ind. Ct. App. 1998) (citing *Huebner*, 104 N.E.2d at 387-88), *trans. denied*. "[F]raud is never presumed, but must be averred and proved as alleged in order to authorize relief because of fraud." *Guydon v. Taylor*, 115 Ind. App. 685, 60 N.E.2d 750, 752 (1945). Lack of consent to contract may be shown in the ordinary ways, for example, by mistake or duress. *See Indianapolis, Decatur W. Ry. Co. v. Sands*, 133 Ind. 433, 32 N.E. 722, 724 (1892) ("[N]o party [to a consent judgment] can . . . be permitted to have [it] modified . . . without showing some . . . mistake by which he was induced to enter into the agreement . . . or without showing some other valid reason why he should be released from it."); *Wagler v. W. Boggs Sewer Dist., Inc.*, 980 N.E.2d 363, 377-78 (Ind. Ct.

App. 2012) (examining claim of duress in consent judgment through contract-law lens), *trans. denied*.

[29] It is well settled that no appeal may be taken from a valid consent judgment. *Pond v. McNellis*, 845 N.E.2d 1043, 1061 (Ind. Ct. App. 2006) (citing *Huebner*, 104 N.E.2d at 388), *trans. denied*. "[T]o say that parties may, by their . . . consent, induce the court to . . . enter a judgment in particular form and language, and then complain that the court erred in doing what they consented . . . it to do[,] . . . is at war with all the rules of practice in this state." *Sands*, 32 N.E. at 724. The preclusive effect on appeal of a consent judgment below reaches both the substance of the judgment itself and all prejudgment rulings in prior proceedings. *McNellis v. Wheeler*, 225 Ind. 148, 73 N.E.2d 339, 340 (1947) (following consent judgment, no appeal from prejudgment rulings on motions for change of venue and to strike counterclaim); *Collins v. Rose*, 59 Ind. 33, 35 (1877) ("[Judgment by agreement] was a waiver of errors in the previous proceedings in the cause and of defects in the pleadings."); *Maiben v. Manlove*, 48 Ind. App. 617, 96 N.E. 501, 503 (1911) ("Where a judgment is entered by consent . . . and the court has jurisdiction of the subject-matter, the parties are estopped . . . from prosecuting an appeal on account of any errors in the proceedings or judgment.").

[30] Here, the consent judgment was valid on its face. The terms of the consent judgment were read in open court. Both parties stated their consent to them in open court. The terms of the judgment order reflected the terms openly recited. While expressly reserving the question of fees for later determination, the

judgment order disposed of all other issues in the case, and concluded by noting that "[a]ll other [motions] are deemed resolved, withdrawn, or vacated." Appellant's App. p. 30. We must therefore affirm the consent judgment unless it was vitiated by fraud, duress, or mistake. Because it was not, we affirm.[4]

[31] Mother claims that the trial court failed to address her "serious allegations of fraud" in the inducement of the consent judgment. Appellant's Br. at 41. However, nothing in either of her motions to correct error of April 21 and 27, 2016, nor in the affidavits attached to them, alleged anything even resembling fraud, that is, a misrepresentation of material fact with knowledge or reckless ignorance of falsity causing injurious reliance. *Siegel v. Williams*, 818 N.E.2d 510, 515 (Ind. Ct. App. 2004). Most obviously, Mother cannot point to any misrepresentation — or even simple mistake — of material fact. Mother has not shown fraud, and we will not presume it. *Guydon*, 60 N.E.2d at 752.

---

[4] The unappealability of consent judgments has sometimes raised the question whether dismissal or affirmance is the proper disposition of the case on appeal. In *Huebner*, our supreme court said, "On appeal the action of a lower court is reviewed [for] error. If an appeal should be allowed from a consent decree, the appellate court would examine the record not to determine whether the lower court committed error, but to determine whether . . . the parties erred in making the[ir] stipulation or in giving their consent thereto. *Appellate courts do not have such authority*." 104 N.E.2d at 469 (emphasis added). This language seems to require dismissal rather than affirmance in cases like that at bar (*Huebner* itself was a criminal case). However, it is uncontested that a consent judgment may be reviewed for validity and scope of consent. Thus, the distinction here seems more apparent than actual if valid consent is thought to waive claims of error on appeal. The older cases affirmed unless appellee moved to dismiss. *See, e.g., Moore v. Am. Nat'l Bank at Indianapolis*, 114 Ind. App. 551, 52 N.E.2d 513, 516 (1944) (granting appellee's motion to dismiss); *Maiben*, 96 N.E. at 503 (same). Here there is no motion to dismiss; we therefore follow the older cases and affirm. *See, e.g., McNellis*, 73 N.E.2d at 343; *Sands*, 32 N.E.2d at 725; *Collins*, 59 Ind. at 35; *Guydon*, 60 N.E.2d at 752; *Hoosier Finance Co. v. Campbell*, 86 Ind. App. 62, 155 N.E. 836, 838 (1927); *Bd. of Comm'rs v. Scott*, 19 Ind. App. 27, 49 N.E. 395, 399 (1898).

[32] In an action to void an enforceable agreement for duress, "the ultimate fact to be determined is whether . . . the purported victim was deprived of the free exercise of [her] own will." *Wagler*, 980 N.E.2d at 378 (quotations and citation omitted). It used to be said that such deprivation must be accomplished by "an actual or threatened violence or restraint of a [wo]man's person, contrary to law, to compel [her] to enter into [an agreement] or discharge one." *In re Paternity of K.R.H.*, 784 N.E.2d 985, 990 (Ind. Ct. App. 2003) (quotations and citation omitted). Our supreme court has observed that "the modern tendency . . . is to regard any transaction as voidable . . . which was coerced by fear of a wrongful act by the other party to the transaction." *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 283 (Ind. 1983) (quotations and citation omitted). We may thus allow for a somewhat broader conception of duress than used to be recognized. Still, a party seeking to void an agreement faces the heavy burden of showing a "subver[sion of] the will" or a "loss of volition" rather than a mere desire to avoid unpleasant consequences. *Id.* However "visibly upset" Mother was at the March 1, 2016, hearing, Appellant's App. p. 34, she has not made the required showing — or even alleged — that her free will was subverted or lost.

[33] In her April 21, 2016, motion to correct error, Mother did allege that, on March 1, 2016, her own mother told her G.B. "said she would kill herself." *Id.* p. 39. The result in this case would perhaps be different if Mother had proved that Father or his counsel approached Mother, or induced her own mother to do so, to threaten that G.B. would commit suicide *unless* Mother agreed not to move

G.B. to Texas. However, Mother has not proved or even alleged such to be true. Mother has shown no connection other than temporal proximity between Father or his counsel and the statement allegedly made by her own mother. Mother has shown no connection other than temporal proximity between the statement allegedly made by her own mother and Mother's consent to judgment. Mother had been told throughout this litigation that her conduct was making G.B. "miserable." Appellant's App. p. 23. To the extent that Mother consented to judgment from a desire to avoid hurting G.B. further, such a desire, while natural and commendable, is not duress legally sufficient to void an enforceable agreement.

[34] Finally, Mother complains that she was unrepresented when the consent judgment was agreed to and entered. Of course, Mother had no right to counsel in this case. *See In re Marriage of Stariha*, 509 N.E.2d 1117, 1119-20 (Ind. Ct. App. 1987) (outlining limited contexts giving rise to right to counsel). It was Mother's choice, and hers alone, after nearly a year of litigation to release her attorney less than two weeks before the case-dispositive hearing of March 1, 2016. The trial court's colloquy with Mother at the opening of that hearing clearly shows that Mother acted voluntarily with full knowledge of the consequences of her conduct. Mother cannot show fraud or mistake in connection with her decision to proceed pro se.

[35] The consent judgment was valid. It therefore precluded any challenge to its substance, including Mother's challenge to the child support order embodied in it. The consent judgment also precluded any challenge to prejudgment rulings,

including Mother's challenges to the trial court's rulings on the GAL and his report, certification for interlocutory review, recusal and change of judge, Father's contempt of court, the GAL's testimony of the bribe offered to G.B., and the TRO.

[36] We note that Mother's challenges to the trial court's prejudgment rulings amount to complaints about alleged procedural defects to which she did not object, or positively assented below, and complaints that the trial court did not weigh Mother's evidence more favorably than Father's. These are advanced without cogent argument setting out and applying the proper legal standard to each asserted claim to relief, tied together by Mother's unshakeable but erroneous conviction that she alone may decide what is in G.B.'s best interests, and that Father's handful of positive drug tests over a one-year period, irrespective of all other factors, mandated a result in her favor; the contrary result could have only been the product of bias and collusion. Preclusion by entry of consent judgment notwithstanding, none of Mother's claims could afford a basis for reversal.

## II. *Rulings on Attorneys' and GAL's Fees*

[37] Litigants in the courts of this state must pay their own attorneys' fees unless a statute, agreement, or rule provides the contrary. *Swartz v. Swartz*, 720 N.E.2d 1219, 1223 (Ind. Ct. App. 1999). By statute, in an action to modify custody, the court "may" order either party to pay a "reasonable amount" for the other party's attorneys' fees. Ind. Code § 31-17-7-1(a). Similarly, a court "may" order either or both parents of a child represented by a GAL to pay a "user fee." *Id.* §

6-9(a); *see also In re Paternity of N.L.P.*, 926 N.E.2d 20, 23 (2010) (analyzing GAL fee in paternity action as "cost" within meaning of paternity-action fee-shifting statute, I.C. § 31-14-18-2(a), materially identical to custody-action fee-shifting statute, I.C. § 31-17-7-1(a)).

[38] Fee awards in family law matters are reviewed for abuse of the trial court's discretion. *Bean v. Bean*, 902 N.E.2d 256, 266 (Ind. Ct. App. 2009). Reversal is proper only where the award is clearly against the logic and effect of the facts and circumstances before the court. *Carrasco v. Grubb*, 824 N.E.2d 705, 712 (Ind. Ct. App. 2012), *trans. denied*. In ruling on a request for fees, the court must consider "the parties' resources, their economic condition, their ability to engage in gainful employment, and other factors that bear on the award's reasonableness," *Bean*, 902 N.E.2d at 266, including "whether fees and litigation expenses were incurred due to the adverse party's misconduct." *Carrasco*, 824 N.E.2d at 712.

[39] As to the reasonableness of the fee requests, the court reviewed Father's affidavit of attorneys' fees and struck $1,480 from its consideration because they were solely occasioned by one of Father's positive drug tests. The court otherwise found the work done and rates charged by Father's counsel to be reasonable, and Mother does not challenge that finding. The court also reviewed the GAL's fee affidavit and found "that the work performed by Mr. James[, a thirty-year family-law practitioner,] was very important and valuable, especially in combination with the Court's *in camera* interview with [G.B.] and ongoing issues regarding drug testing, relocation of Mother, [G.B.]'s wishes,

Mother's [fiancé] and situations with siblings." Appellant's App. p. 25. Mother is less sanguine about the value of the GAL's performance, but the trial court had before it Mother's multiple unsuccessful prejudgment motions challenging the GAL, as well as three of Mother's post-judgment filings on the specific question of fees, before issuing its order as to the GAL's fees on March 29, 2016. We will not reweigh that material now.

[40] As to the reasonableness of the apportionment of fees, the trial court set out the reasons for its apportionment most fully in its April 25, 2016, order on attorneys' fees. That order considered the parties' resources and relative incomes, Mother's $120,000 per year compared to Father's maximum of $30,000 per year. In establishing the latter figure, the court relied on Father's tax returns from 2013 and 2015, Mother's testimony regarding Father's earning potential, and Mother's independent research into the median income for auto mechanics. In addition to the "vast" income disparity, *id.* p. 22, the trial court also considered that "the hefty fee bills were in large part unnecessarily incurred by Mother's unreasonable behavior." *Id.* p. 23. Mother takes a different view of her conduct, but we defer to the trial court's proximity to the facts and the parties.

[41] The trial court based its fee rulings on a review of the record, the parties' submissions, and the factors it was bound by law to consider. These rulings were not clearly against the logic and effect of the facts before it. There was no abuse of discretion.

### III. Father's Request for Sanctions

[42] We may award damages, including attorneys' fees, to an adverse party to an appeal that is "frivolous or in bad faith." Ind. Appellate Rule 66(E). To merit damages, an appeal must be "permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Even so, we exercise "extreme restraint" in awarding damages lest the right to appeal be chilled. *Id.*

[43] Our analysis divides

> claims for appellate attorney fees into "substantive" and "procedural" bad faith claims. To prevail on a substantive bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. Procedural bad faith, on the other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court.

*Id.* at 346-47 (citations omitted).

[44] Procedurally, Mother's compliance with the Appellate Rules is imperfect, including, for example, argument in her fact statement. *See* App. R. 46(A)(6); *Thacker*, 797 N.E.2 at 347. Nevertheless, on the whole, we cannot say that Mother's submissions, with regular citations to the record and a well-organized appendix, for example, were not in good faith or were "calculated to require the maximum expenditure of time" on our part or Father's. *Thacker*, 797 N.E.2d at

346. Indeed, in his brief, Father simply adopts Mother's statement of the case and statement of facts. Appellee's Br. at 6. Father will not be heard to complain of what he has incorporated into his own brief.

[45] Substantively, Mother's submissions approach being "utterly devoid of all plausibility," *id.*, but we note that Father has needlessly multiplied his expenses on appeal by failing to recognize the unappealibilty of a valid consent judgment, instead responding in detail to each of Mother's garbled claims in a lengthy brief. Argument that is truly in bad faith does not invite or even permit such exhaustive counterargument. Mother will not be made to pay for it.

## Conclusion

[46] Mother's consent to judgment was not the product of fraud, mistake, or duress. Her consent precluded her appellate challenges to the judgment itself and to the trial court's rulings antecedent to it. The trial court did not abuse its discretion in ordering Mother to pay seventy percent of Father's attorneys' fees and seventy-five percent of the GAL's fees. The judgment of the trial court is therefore affirmed. Father is not entitled to appellate sanctions.

[47] Affirmed.

Baker, J., and Pyle, J., concur.